# NOTICE OF REMOVAL

# EXHIBIT 117

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

# EXHIBIT 116



## HIGHLY CONFIDENTIAL
## SUBJECT TO PROTECTIVE ORDER
## INFORMATION REDACTED

# Transcript of Scott Ellington

**Date:** July 29, 2021

**Case:** UBS Securities LLC, et al. -v- Highland Capital Management, L.P.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

**Page 1**

```
 1    IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
 2              DALLAS DIVISION
      In re
 3                              § Chapter 11
      HIGHLAND CAPITAL          § Case No. 19-34054-SGJ11
 4    MANAGEMENT, L.P.,         §
                                §
 5              Debtor.         §
                                §
 6                              §
      UBS SECURITIES LLC AND    §
 7    UBS AG LONDON BRANCH,     §
                                §
 8              Plaintiffs,     §
                                § Adversary Proceeding
 9         vs.                  § No. 21-03020-sgj
                                §
10    HIGHLAND CAPITAL          §
      MANAGEMENT, L.P.,         §
11                              §
              Defendant.        §
12
13            HIGHLY CONFIDENTIAL
14        SUBJECT TO PROTECTIVE ORDER
15           INFORMATION REDACTED
16          Videotaped Deposition of
17          SCOTT BYRON ELLINGTON
18             Conducted Virtually
19          Thursday, July 29, 2021
20              10:39 a.m. EST
21
22    Job No.: 386794
23    Pages: 1 - 407
24    Reported by: Lisa M. Barrett, RPR, CRR, CRC, CSR
25
```

**Page 2**

```
 1        Videotaped virtual deposition of SCOTT BYRON
 2    ELLINGTON, pursuant to notice, before Lisa M.
 3    Barrett, a Certified Shorthand Reporter,
 4    Registered Professional Reporter, Certified
 5    Realtime Reporter, and a Notary Public in and for
 6    the State of Maryland.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                  APPEARANCES
 2    ON BEHALF OF PLAINTIFFS UBS SECURITIES LLC
 3    AND UBS AG LONDON BRANCH:
 4         Andrew B. Clubok (Via Zoom)
 5         LATHAM & WATKINS LLP
 6         555 Eleventh Street, N.W., Suite 1000
 7         Washington, D.C. 20004
 8         (202) 637-2200
 9         Andrew.clubok@lw.com
10
11         Shannon E. McLaughlin
12         Robert Allen
13         LATHAM & WATKINS LLP
14         1271 Avenue of the Americas
15         New York, NY 10020
16         (212) 906-4612
17         Shannon.mclaughlin@lw.com
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              APPEARANCES CONTINUED
 2    ON BEHALF OF DEFENDANT HIGHLAND CAPITAL
 3    MANAGEMENT, L.P.:
 4         Robert J. Feinstein (Via Zoom)
 5         Greg Demo
 6         PACHULSKI STANG ZIEHL & JONES LLP
 7         780 Third Avenue, 34th Floor
 8         New York, New York 10017-2024
 9         (212) 561-7700
10         Rfeinstein@pszjlaw.com
11
12
13    ON BEHALF OF THE WITNESS:
14         Frances A. Smith
15         Eric Soderlund
16         ROSS & SMITH, PC
17         700 N. Pearl Street, Suite 1610
18         Dallas, Texas 75201
19         (214) 377-7879
20         Frances.smith@judithwross.com
21
22
23
24
25
```

**9**

PREVIOUSLY MARKED EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 50 | .................................. | 140 |
| Exhibit 26 | .................................. | 152 |
| Exhibit 77 | .................................. | 156 |
| Exhibit 39 | .................................. | 190 |
| Exhibit 26 | .................................. | 197 |
| Exhibit 28 | .................................. | 199 |
| Exhibit 61 | .................................. | 255 |
| Exhibit 47 | .................................. | 284 |
| Exhibit 2 | .................................. | 310 |
| Exhibit 82 | .................................. | 329 |
| Exhibit 38 | .................................. | 333 |
| Exhibit 55 | .................................. | 339 |
| Exhibit 69 | .................................. | 354 |
| Exhibit 70 | .................................. | 365 |

**10**

1  HIGHLY CONFIDENTIAL
2  Videotaped Deposition of Scott Ellington
3  Conducted Virtually
4  Thursday, July 29, 2021
5  --- Commencing at 10:30 a.m. (EST)
6  REMOTE TECHNICIAN: Thank you to
7  everyone for attending this proceeding remotely,
8  which we anticipate will run smoothly.
9  Please remember to speak slowly and do
10  your best not to talk over one another. Please be
11  aware that we are recording the proceeding for
12  backup purposes. Any off-the-record discussion
13  should be had away from the computer. Please
14  remember to mute your mic for those conversations.
15  Have your video enabled to help the
16  reporter identify who is speaking. If you are
17  unable to connect with the video and are
18  connecting via phone, please identify yourself
19  each time.
20  And apologies in advance for any
21  technical-related interruptions. Thank you.
22  THE VIDEOGRAPHER: Here begins video
23  file number 1 in the video deposition of Scott
24  Ellington in the matter of UBC (sic) Securities
25  versus Highland Capital Management in the United

**11**

1  states Bankruptcy Court for the Northern District
2  of Texas, Dallas Division. Case number
3  1934054FGJ11.
4  Today's date is July 29th, 2021.
5  The time on my video monitor is
6  10:40 a.m., eastern time.
7  My name is Robert Leonard. I'm the
8  Video Specialist. I represent Planet Depos.
9  This deposition is being taken via Zoom
10  online.
11  Will counsel please identify themselves
12  verbally and state who they represent.
13  MR. CLUBOK: Good morning. This is
14  Andrew Clubok and Shannon McLaughlin from Latham &
15  Watkins LLP on behalf of UBS.
16  MR. FEINSTEIN: Good morning. This is
17  Robert Feinstein, Pachulski Stang Ziehl & Jones.
18  We are counsel for the defendant in the adversary
19  proceeding, Highland Capital Management LP.
20  My colleague Greg Demo is also on the
21  Zoom.
22  MS. SMITH: Good morning. Frances
23  Smith with Ross and Smith on behalf of the
24  non-party witness, Scott Ellington.
25  MR. CLUBOK: Okay. Can you swear the

**12**

1  witness in, please.
2  THE VIDEOGRAPHER: The court reporter
3  today is Lisa Barrett. She also represents Planet
4  Depos.
5  Will the court reporter please swear in
6  the witness.
7  (OATH STIPULATION)
8  SCOTT BYRON ELLINGTON, called as a witness,
9  having been duly sworn was examined
10  and testified as follows:
11  EXAMINATION
12  BY MR. CLUBOK:
13  Q   Okay. Good morning, Mr. Ellington.
14  A   Good morning, Mr. Clubok.
15  Q   Can you state your full name, please?
16  A   Scott Byron Ellington.
17  Q   What is your home address?
18  A   I currently don't have a home address.
19  I recently sold the place I was living.
20  Q   Where are you living right now?
21  A   I'm staying between my father's house
22  and my girlfriend's house.
23  Q   And today, you are taking the
24  deposition at your girlfriend's house.
25  A   Correct.

HIGHLY CONFIDENTIAL - STPO - INFORMATION REDACTED

Transcript of Scott Ellington

Conducted on July 29, 2021

9 (33 to 36)

---

33

1 I don't know what Ms. Irving's ability to work
2 looks like in the future.
3    Q    And what about Mr. Leventon?
4    A    I would highly assume so.
5    Q    Highly assume that he would be slated
6 to get equity when you figure out a plan for
7 distributing equity to employees; correct?
8    A    I agree.
9    Q    When did you get the idea to form
10 Skyview?
11    A    Five years ago.
12    Q    And did you make efforts to make
13 Skyview a reality prior to leaving Highland
14 Capital Management?
15       MS. SMITH: Objection as to form.
16       THE WITNESS: Yes. Yes, several times.
17 BY MR. CLUBOK:
18    Q    And so you'd been planning to form
19 Skyview during the last year of working at
20 Highland Capital Management, at least; correct?
21    A    Yes, for many years before that.
22    Q    In fact, you incorporated just two days
23 after you were fired from Highland Capital
24 Management?
25       MS. SMITH: Objection as to form.

34

1       THE WITNESS: I don't know when the
2 entity was incorporated.
3 BY MR. CLUBOK:
4    Q    Fair to say it was very shortly after
5 you were terminated from Highland Capital
6 Management?
7    A    That would be my assumption, yes.
8    Q    Does Jim Dondero have any sort of
9 economic stake in Skyview, in -- directly or
10 indirectly?
11    A    No.
12    Q    What is Mr. Dondero's relationship to
13 Skyview, if any?
14       MS. SMITH: Objection as to form.
15       THE WITNESS: Mr. Dondero's entity is
16 related to Helm (inaudible) or some of the
17 contractual clients.
18 BY MR. CLUBOK:
19    Q    And Skyview is currently operating out
20 of NexBank's offices; correct?
21       MS. SMITH: Objection as to form. He's
22 already explained that multiple times.
23       THE WITNESS: Skyview employees on an
24 ad hoc basis work in the NexBank offices.
25       I don't know how many, but I certainly

35

1 wouldn't consider it as operating out of NexBank's
2 offices.
3 BY MR. CLUBOK:
4    Q    Have any Skyview employees given the
5 NexBank offices as their business address as far
6 as you know?
7    A    I have no idea what they've given as a
8 business address.
9    Q    When you worked out agreements with
10 your clients, did you ever include a business
11 address for Skyview Group in any of those
12 agreements?
13    A    I haven't been involved in working out
14 those agreements.
15    Q    Has Skyview ever represented to any
16 clients that its business address was the NexBank
17 office?
18    A    I --
19       MS. SMITH: Objection as to form.
20       THE WITNESS: Sorry. I don't know.
21 BY MR. CLUBOK:
22    Q    If they did so, that would be false;
23 correct?
24       MS. SMITH: Objection as to form.
25       THE WITNESS: That would be false, in

36

1 my opinion, yes.
2 BY MR. CLUBOK:
3    Q    So if a Skyview employee was
4 representing that his or her business address was
5 the NexBank office, that would be a false
6 statement; correct?
7       MS. SMITH: Objection as to form.
8       THE WITNESS: To me, it would be
9 because I don't consider that where Skyview's
10 offices are since a very small number of
11 employees, as far as I know, worked there on an ad
12 hoc basis.
13 BY MR. CLUBOK:
14    Q    Do you have any other employment
15 currently? And I apologize if I asked that
16 already, but...
17    A    I do not. You already asked, and I do
18 not.
19    Q    Do you have any other source of income,
20 other than the income you get from Skyview Group?
21    A    Well, I have shares in the REITs that
22 are granted by the independent board members to
23 myself. But I don't know if you would consider
24 that income or not.
25    Q    The REITs that Skyview Group manages?

HIGHLY CONFIDENTIAL - STPO - INFORMATION REDACTED

Transcript of Scott Ellington

Conducted on July 29, 2021

10 (37 to 40)

---

**37**

1  A  Skyview Group does not manage anything.

2  Q  All right.  Are these REITs that are

3  clients of Skyview Group?

4  A  NexPoint Advisors --

5  MS. SMITH: Objection as to form.

6  THE WITNESS: Sorry, Frances, I keep

7  stepping on you, I apologize.

8  NexPoint Advisors is the investment

9  manager that manages the REIT on our part.

10 BY MR. CLUBOK:

11  Q  And is NexPoint Advisors a part of

12 Skyview Group?

13  A  Yes.

14  Q  And you are allocated shares in the

15 REITs that NexPoint Advisors manages; correct?

16  A  Yes.  And -- by the independent board

17 members, as they see fit.

18  Q  Do you have any other source of income?

19  A  No.

20  Q  As a rough percentage, what do you

21 expect your Skyview Group income to be in terms of

22 your total income as vis-a-vis the REITs?

23  MS. SMITH: Objection as to form.

24 Again, none of this is relevant to the topics of

25 the deposition.

---

**38**

1  THE WITNESS: I wouldn't know how to

2  calculate that because they could give me zero or

3  they could give me ad infinitum shares.  But in

4  looking historically, it would be less than

5  probably -- I don't know, I'd have to do the math,

6  but about 10 or 15 percent.  But, again, it's not

7  necessarily income.

8  Q  Are there any subsidiaries of Skyview

9  Group?

10  A  I would -- I would have to have

11 somebody update the org chart.  I know that that's

12 been considered, but I don't know what's been

13 implemented.

14  Q  Have you ever heard of an entity called

15 Skyview Legal PC?

16  A  I know that something was being

17 discussed about a legal PC.  I don't know what the

18 gentlemen working on it decided to name it or if

19 it's been implemented.

20  Q  Who's the gentlemen working on it?

21  A  I believe JP Seery and Isaac Leventon

22 were the people in charge of that.

23  Q  Do you know what CPCM LLC is?

24  A  I do.

25  Q  What is it?

---

**39**

1  A  I believe it's an entity that holds

2  claims that the former Highland employees

3  potentially have against the debtor.

4  Q  Did you assign your claim to CPCM?

5  A  I believe I did.

6  Q  For what consideration?

7  A  My employment.

8  Q  Your employment with whom?

9  A  My employment with Skyview.

10  Q  You own Skyview; correct?

11  A  Correct.

12  Q  And you had to assign your claim to

13 CPCM as -- in order to get a job with a company

14 you fully owned?

15  A  No.

16  Q  Okay.  So was there any consideration

17 at all for the assignment of your claim to CPCM?

18  MS. SMITH: Objection to form.  He's

19 already answered that.

20  (No response)

21 BY MR. CLUBOK:

22  Q  Was there any consideration at all for

23 the assignment of your claim to CPCM?

24  A  I believe it was my employment with

25 Skyview.

---

**40**

1  Q  But that employment you had the right

2  to give yourself, regardless of whether or not you

3  assigned your claim to CPCM as a hundred percent

4  owner of Skyview; correct?

5  MS. SMITH: Objection to form.

6  THE WITNESS: Theoretically, yes.

7  BY MR. CLUBOK:

8  Q  Not just theoretically, actually, as

9  far as you know.

10  As far as you understand, owning a

11 company a hundred percent, you certainly had the

12 right to employ yourself in any capacity you

13 chose; correct?

14  A  Yeah, I would agree with that.

15  Q  And is there any other consideration

16 at all that you could identify, even a peppercorn,

17 for the transfer or assignment of your claims to

18 CPCM?

19  A  I don't remember the agreements in

20 detail.  I'd have to look at the agreements

21 relating to (inaudible) to see what (inaudible)

22 was considered.

23  Q  But as you sit here today, you are not

24 aware of any; correct?

25  A  Not that I can recall, but there may be

---

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM   INDEX NO. 650744/2023
NYSCEF DOC. NO. 121   HIGHLY CONFIDENTIAL - STPO - INFORMATION REDACTED   RECEIVED NYSCEF: 02/08/2023

Transcript of Scott Ellington
Conducted on July 29, 2021                                          11 (41 to 44)

**41**

1 some.
2      Q   Well, we're going to put up Exhibit 1.
3 By the way, do you have exhibits in front of you?
4      A   I have a folder of (inaudible) yes,
5 sir, I do.
6      Q   Okay. Take a look at Exhibit 1.
7      A   Give me a second to find it.
8      Q   Sorry. It's -- I said Exhibit 1.
9          It is Tab actually 1, and it is going
10 to be Exhibit 86. I apologize.
11         (Deposition Exhibit 86 was marked for
12 identification.)
13         THE WITNESS: Exhibit 86. Okay.
14 BY MR. CLUBOK:
15     Q   You may or may not have that one in
16 your --
17     A   I believe that they end at 84.
18     Q   Okay. So we'll put up tab -- or
19 Exhibit 86 on the screen.
20         Exhibit 86 is a Notice of Transfer of
21 Claim Other Than for Security by Scott Ellington
22 to CPCM.
23     A   Okay.
24         MS. SMITH: Andy, since we are not
25 copied on the exhibits, could someone please load

**42**

1 them into the chat?
2          MR. CLUBOK: Yes. We'll start to make
3 them --
4          Shannon, maybe you can circulate them
5 at the same time that we put them up on the
6 screen.
7          MS. McLAUGHLIN: Certainly.
8          MR. CLUBOK: Thank you.
9 BY MR. CLUBOK:
10     Q   And Mr. Ellington, can you --
11         MR. CLUBOK: Let's see.
12         Nate, we got it up there?
13         REMOTE TECHNICIAN: Yes, I will -- I
14 will circulate the document in chat. Or actually,
15 Shannon has already done --
16         MR. CLUBOK: Can you put the document
17 on the screen, or maybe it's up there and I just
18 don't see it.
19         REMOTE TECHNICIAN: Yes. Thank you,
20 one moment.
21 BY MR. CLUBOK:
22     Q   So this is the -- do you recognize
23 Exhibit 86 as the Notice of Transfer of Claim
24 Other Than for Security with respect to yourself,
25 as the transferor and CPCM as the transferee?

**43**

1      A   I see that written on the document,
2 yes.
3      Q   And on page 2, it says, "For value
4 received, the adequacy and sufficiency of which
5 are hereby acknowledged, Scott Ellington has
6 unconditionally and irrevocably sold, transferred,
7 assigned to CPCM," et cetera, et cetera.
8          Do you see that?
9      A   I do.
10     Q   And as far as you sit here today, the
11 only consideration you can think of is the
12 employment you gave yourself at Skyview Group;
13 correct?
14     A   And, again, I'd have to see the --
15         MS. SMITH: Objection, form.
16         THE WITNESS: I'd have to see all
17 the -- the related documents. But that's --
18 that's what I consider the consideration without
19 looking at the documents.
20 BY MR. CLUBOK:
21     Q   What documents would you have to look
22 at?
23     A   I don't know what's out there related
24 to this. I'm being shown two pages. I wasn't
25 involved in negotiation or drafting of these. I

**44**

1 don't know what else is relatable.
2      Q   Were you involved in any negotiation of
3 the transfer of claims to CPCM by any -- any
4 individual?
5      A   No.
6      Q   Were you involved at all in the
7 approval of those transfers?
8      A   No.
9      Q   Did you have any involvement at all?
10     A   None.
11     Q   You just -- who told you about it?
12     A   I believe counsel.
13     Q   You learned about the transfers through
14 counsel and no other -- no other source?
15         MS. SMITH: Objection to form.
16         THE WITNESS: Yeah. Yes, at the time I
17 was under a restraining order, so I had very
18 limited communication with anyone, but counsel.
19     Q   Do you know whose idea it was to
20 transfer the claims to the CPCM?
21         MS. SMITH: Objection.
22         THE WITNESS: No, I don't.
23         MS. SMITH: Do not answer to the extent
24 it calls for privileged information.
25         THE WITNESS: I do not know.

45

BY MR. CLUBOK:

Q   Did you ever discuss it with anyone other than your counsel?

A   No.

Q   CPCM is wholly owned by Skyview Group?

A   I'd have to look at an org chart or related documents. I'm not certain, but that's my understanding.

Q   So you have all the economic interest in CPCM; correct?

A   Again, I'd have to look at how it was structured.

I don't -- I just know anecdotally what I was told.

Q   As far as you know sitting here today, can you -- are you aware of anyone else who has any other economic interest in CPCM other than you?

A   No, I think it's a wholly-owned sub of Skyview, but, again, I'd have to look at the documents to be certain.

Q   CPCM is represented by Ross and Smith and Baker MacKenzie.

A   That's my understanding, yes.

Q   And these are the attorneys who are

46

sitting here today with you during this deposition?

A   Yes.

Q   And Mr. Sevilla, Mr. Leventon, Mr. DiOrio and Ms. Lucas/Irving also shared that same set of counsel; correct?

A   That's my understanding, yes.

Q   Who is paying the legal fees for Ross and Smith?

A   I'm not certain.

MS. SMITH: Objection to form.

BY MR. CLUBOK:

Q   You have -- Ross and Smith, Ms. Smith has been here object -- making these objections. She has got a colleague of hers also sitting on this deposition, and you have no idea who's paying their bills?

A   No, I don't.

Q   Who else do they represent, other than you, CPCM, Mr. Sevilla, Mr. Leventon and Mr. DiOrio and Ms. Irving?

A   No, I don't.

MS. SMITH: Objection -- objection, calls for speculation and potentially privileged communications.

47

BY MR. CLUBOK:

Q   Are you aware of anyone else they represent?

A   I believe they represent Mr. Waterhouse and potentially Mr. Collins. I believe them or a subset of them represents Skyview as an entity, but I don't know that for a fact as I haven't seen those engagement letters with my own eyes.

Q   Who hired them?

A   Who hired whom?

Q   Who hired Ross and Smith to represent you and your colleagues?

A   Well, I personally hired them to represent me. I would assume each individual hired them on their own behalf.

Q   And when you hired them, did you -- you worked out no payment arrangements with them; you just hired them and didn't have any compensation worked out?

MS. SMITH: Objection to form.

THE WITNESS: The payor of the bills, as far as I understand, are through various indemnities and insurance policies with entities and insurers. But, again, that's not -- I'm not the person that processes or pays the bills, so I

48

don't know how they're being paid.

BY MR. CLUBOK:

Q   When you -- when you said you were going to work with Ms. Smith, did you discuss compensation in any way of who would pay for it?

MS. SMITH: Objection, privileged.

THE WITNESS: Yeah, I think that's getting into privileged communications.

BY MR. CLUBOK:

Q   Do you have any idea who is paying Ms. Smith's bills to represent you and your colleagues?

A   Currently, no.

Q   Did you ever have any idea as to who was going to be paying Ms. Smith's bills to represent you, your colleagues and the company you 100 percent own?

A   Yes.

MS. SMITH: Objection to form.

BY MR. CLUBOK:

Q   And who -- and what was your understanding?

A   At the inception, I believe it was an entity called Gov Re.

Q   So when you first hired Ms. Smith, you

Transcript of Scott Ellington

Conducted on July 29, 2021

14 (53 to 56)

---

53

1    THE WITNESS: It's an assumption,
2 Mr. Waterhouse.
3 BY MR. CLUBOK:
4    Q  Did you discuss with any individual
5 other than your -- the lawyers assigning any
6 claims to Skyview Group?
7         -- (overspeaking) --
8    A  Assigning --
9    Q  Excuse me -- (overspeaking) --
10 assigning things with CPCM?
11   A  No, only discussed with counsel.
12   Q  When were you first employed by
13 Highland Capital Management?
14   A  May of 2007.
15   Q  How did you start working for Highland
16 Capital Management?
17   A  I was in the syndications group, the
18 real estate group of Wells Fargo. Highland bought
19 into those syndicated levels, and they asked me to
20 come interview to work in-house with them.
21   Q  Prior to Wells Fargo, where did you
22 work?
23   A  Countrywide Home Loans.
24   Q  Doing what?
25   A  In the syndications group, and in the

---

54

1 -- ultimately in the bankruptcy group.
2    Q  Doing legal work?
3    A  Yes.
4    Q  Prior to -- sorry, Countrywide, you
5 said?
6    A  Yeah, Countrywide Home Loans.
7    Q  What did you do prior to working at
8 Countrywide?
9    A  I worked at a talent agency in Los
10 Angeles.
11   Q  In what capacity?
12   A  It was an assistant.
13   Q  What year?
14   A  The year would have been starting in
15 2000.
16   Q  So when did you graduate law school?
17   A  2000.
18   Q  And your first job was as an assistant
19 at a talent agency.
20   A  Yes.
21   Q  Why did you do that?
22   A  Because to get into the top talent
23 agencies, you had to have a law degree with an
24 MBA, and I wanted to work in the film industry.
25   Q  Okay. And when did you move to

---

55

1 Countrywide?
2    A  It would have been about 2002, I
3 believe.
4    Q  Okay. Going back to your employment
5 with HCM, when you first started there, what was
6 your job title?
7    A  In-house counsel.
8    Q  And eventually you became the general
9 counsel?
10   A  Yes.
11   Q  When was that?
12   A  I'd have to go back and look. I don't
13 recall. But I believe it was around 2010.
14   Q  So, after the -- you remember that UBS
15 filed a lawsuit against Highland in roughly
16 2000 -- in early 2009?
17   A  Yes.
18        MS. SMITH: Objection -- objection.
19 Before you start this line of questioning, I want
20 to caution you, Mr. Ellington, not to disclose any
21 privileged communications with counsel that you
22 might have gotten in your role as Highland Capital
23 GC, unless the debtor -- or I will rely on the
24 debtor to assert privilege, if needed.
25        MR. FEINSTEIN: Well, yes. It is Rob

---

56

1 Feinstein. So that privilege does belong to the
2 debtor and the extent to which we assert the
3 privilege, you will know on a question-by-question
4 basis.
5        If you don't hear an objection from us,
6 it's because we determined either the privilege
7 doesn't apply or one of the recognized exceptions
8 apply, like the crime fraud exception, or that
9 we're waiving it. But in all events, we'll assert
10 the privilege as and if we see fit; otherwise,
11 counsel should feel free to answer the question --
12 excuse me, the witness should feel free to answer
13 the questions.
14        THE WITNESS: Mr. Feinstein, thank you.
15 BY MR. CLUBOK:
16   Q  Do you understand?
17   A  Yes.
18   Q  Do you understand the consent?
19   A  Yes.
20   Q  So you became general counsel after UBS
21 filed its lawsuit against Highland in New York?
22   A  Yes.
23   Q  And in addition to being general
24 counsel, were you a partner in Highland Capital
25 Management?

Transcript of Scott Ellington

15 (57 to 60)

Conducted on July 29, 2021

57

1  A  Ultimately, yes.
2  Q  When was that?
3  A  I don't remember the date.
4  Q  Roughly?
5  A  I want to say around '13, maybe '12 --
6  2012 or 2013.
7  Q  Okay. And you remained a partner until
8  the bankruptcy?
9  A  Until my termination, yes.
10  Q  Until your termination.
11    And did you remain general counsel
12  until your termination?
13  A  Yes.
14  Q  Who did you report to at Highland?
15  A  Jim Dondero.
16  Q  Where did you work?
17  A  In the offices at the Crescent.
18  Q  Were you physically near Jim Dondero,
19  your office?
20  A  No, I was not physically near Dondero.
21  Q  Same floor?
22  A  Same floor, yes. There was only one
23  floor.
24  Q  And you had your own private office?
25  A  I did.

58

1  Q  And you spoke with Mr. Dondero on an
2  average of a daily basis?
3  A  Yes.
4    MS. SMITH: Objection as to form.
5    THE WITNESS: I'm sorry, Frances.
6    Yes.
7  BY MR. CLUBOK:
8  Q  Did anyone report to you directly at
9  Highland Capital Management?
10  A  Yes.
11  Q  Who?
12  A  I'll try my best to give an exhaustive
13  least.
14    Thomas certainly reported to me in his
15  deputy general counsel role, but not in his chief
16  compliance officer role.
17    JP Sevilla, Ms. Irving, Mr. DiOrio,
18  Ms. Vitiello, Ms. Leventon -- I mean, Mr.
19  Leventon, sorry. I think that was the direct
20  reports upon determination, but at different
21  times, it's been various other people.
22  Q  What about Lauren Thedford?
23  A  She did not report to me. She reported
24  to Mr. Surgent.
25  Q  And what about Jason Post?

59

1  A  Reported to Mr. Surgent.
2  Q  When he was the chief compliance
3  officer?
4  A  Yeah, they -- they were in
5  compliance-based roles at the end of my tenure.
6  Q  When Mr. Surgent was the chief
7  compliance officer, who did he report to?
8  A  Jim Dondero.
9  Q  Was there anyone else in the Highland
10  Capital Management legal department, other than
11  the names you've identified?
12  A  Sarah Bell, my executive assistant,
13  reported to me. I believe she may have reported
14  to Mr. Collins. I believe she reported to
15  Mr. Collins, technically.
16  Q  Anyone else in the Highland Capital
17  Management legal department?
18  A  Not that I can recall.
19  Q  Prior to becoming general counsel, were
20  you the assistant general counsel?
21  A  I was.
22  Q  And did you ever hold a title of
23  portfolio manager?
24  A  I did.
25  Q  When?

60

1  A  I'd have to go back and think about
2  that, Mr. Clubok. I apologize. But it was, I
3  want to say, '08 and '09, maybe in '10.
4  Q  When you communicated with Mr. Dondero,
5  is it fair to say you -- you communicated
6  verbally, like in-person?
7  A  I communicated verbally in-person as
8  well as telephonically.
9  Q  How about by text message?
10  A  Very limited.
11  Q  When you would text message with
12  Mr. Dondero, which phone would you use?
13  A  214-649-5475.
14  Q  Did you use any other messenger systems
15  to communicates with Mr. Dondero, like --
16  A  No.
17  Q  Did you ever use signal or What's App
18  or any other text messaging?
19  A  No, I exclusively communicated with
20  Mr. Dondero on iMessage.
21  Q  iMessage on your iPhone?
22  A  Yes.
23  Q  Did he have an iPhone?
24  A  Yes.
25    MS. SMITH: Objection, form.

61
1  BY MR. CLUBOK:
2      Q  Did you ever email with him?
3      A  Yeah, there was -- there was emails
4  with Mr. Dondero.
5      Q  Who set your compensation at HCM?
6      A  I believe there was a compensation
7  committee, but the ultimate arbiter was
8  Mr. Dondero.
9      Q  Did you have responsibilities for any
10 other HCM-affiliated or managed entities while you
11 were the general counsel at Highland Capital
12 Management?
13     A  I believe that I was a managing member
14 or officers of various entities at different
15 times.
16     Q  Did any of those entities separately
17 compensate you for the work you did?
18     A  No.
19     Q  So all of the compensation you received
20 came -- even if you did it on behalf of some of
21 these other entities came directly from Highland
22 Capital Management LP?
23     A  Yes.
24     Q  Was there ever a time when one of
25 Highland's affiliated or managed funds paid you

62
1  directly?
2      A  Again, only with --
3         MS. SMITH: Objection to form.
4         THE WITNESS: Again, only with the
5  exception of the NexPoint Advisor-managed REITs
6  when I was granted shares.
7  BY MR. CLUBOK:
8      Q  So other than NexPoint Advisor-managed
9  REITs in which you were granted shares, there was
10 never a Highland Capital Management affiliate or
11 managed fund that paid you directly; is that
12 correct?
13     A  That paid me directly, no.
14     Q  Is that correct?
15     A  That's what -- that's my belief, yes.
16     Q  And by the way, that was an example of,
17 I think, a double negative.
18        The only reason I reiterated that
19 question is if I say -- if you say -- I said was
20 there -- I said was there never.
21        I put in a negative.  And you said
22 "No," and so it became a little confusing.  So
23 I am just going to ask that question again without
24 the negative.
25     A  Please.

63
1      Q  So I can get it clean for the record.
2         And when you say -- it's like if I said
3  it's not raining range outside and you said "No,"
4  you're meaning yes, it's not raining, but it says
5  no.  So, anyway, I'm just going to ask you that
6  again just not to make you repeat, but just so you
7  can answer.  Whatever your answer is I don't care.
8  I just want to --
9      A  Yes, I understand that.
10     Q  Okay.  So is it true that other than
11 the NexPoint advisor-managed REITs in which you
12 were granted shares, there was never a Highland
13 Capital Management affiliate or managed fund that
14 paid you directly while you were working at HCM;
15 correct?
16        MS. SMITH: Objection to form.
17        THE WITNESS: That is my understanding,
18 yes.
19 BY MR. CLUBOK:
20     Q  When you were at Highland, you used
21 email addresses that ended in "hcmlp.com" and
22 "highlandcapital.com?"
23     A  Yes.
24     Q  Did you ever use any other email to
25 conduct any business for Highland or any of its

64
1  affiliates?
2         MS. SMITH: Objection to form.
3         THE WITNESS: For Highland or its
4  affiliates, no.
5         MR. CLUBOK: I'm sorry.  What was the
6  form objection to that, Ms. Smith?
7         MS. SMITH: That was a -- that was a
8  compound question.
9         MR. CLUBOK: Okay.  I'm trying to --
10 one second here.  My wife just nicely brought me a
11 cup of coffee.
12        MS. SMITH: I wish I had someone
13 bringing me coffee.
14        MR. CLUBOK: It's very nice.  You guys
15 may regret that I have coffee.  I don't know.
16        Sorry, let me back to it.
17 BY MR. CLUBOK:
18     Q  When you conducted business for
19 Highland Capital Management, did you ever use any
20 other email, other than the HCMLP.com or the
21 HighlandCapital.com?
22     A  No, not for business related to
23 Highland Capital Management.
24     Q  While you were employed at Highland
25 Capital Management, did you ever use any email for

---

65

1  any other business-related purpose?
2      A  Yes.
3      Q  And what emails -- what email or emails
4  were that?
5      A  WWWSA -- or my name, sorry,
6  "sasmgt.com."
7      Q  Under what circumstances would you use
8  the sasmanagement.com email?
9      A  In things related to SAS or Sentinel or
10  its related entities.
11     Q  Why?
12     A  Because we were instructed by
13  compliance that all aspects of those businesses
14  should be conducted on their own servers and
15  completely separate from Highland Capital
16  Management LP.
17     Q  Okay, other than that email address and
18  the Highland-related email addresses that you've
19  already mentioned, was there ever any other email
20  that you used for any business purposes while you
21  were employed at Highland Capital Management?
22     A  Not that I recall.
23     Q  Did you ever -- what is Blackland
24  Associates?
25     A  Consulting firm.

66

1      Q  When was that -- what -- does that have
2  any connection with Highland Capital Management?
3      A  None.
4      Q  Did you ever use emails with the
5  blacklandassociates.com?
6      A  No.
7      Q  Did you ever -- what's your sister's
8  name.
9      A  I have two sisters.
10     Q  What are their names?
11     A  Sharon Ellington and Marcia Maslow.
12     Q  Have either of those individuals ever
13  done any work in connection with Highland Capital
14  Management?
15     A  My sister Marcia assisted on some IT
16  projects.
17     Q  Any other work that either of them ever
18  did in connection with your work at Highland
19  Capital Management?
20     A  My -- my other sister is an estate
21  planning attorney, and she's helping me with my
22  personal finances.
23     Q  Anything else?
24     A  Not that I -- not that I recall.
25     Q  Have you ever heard of OG Ventures?

67

1      A  OG Ventures? No.
2      Q  Were you surprised when you were hired
3  from Highland Capital Management?
4      A  Yes.
5          MS. SMITH: Objection as to form.
6  BY MR. CLUBOK:
7      Q  Did you have a chance to clean out your
8  office?
9      A  No.
10     Q  Have you performed any services for any
11  HCM-related entities since your termination?
12     A  Other than in my employment with
13  Skyview, but I don't know that it's considered
14  related anymore due to the bankruptcy.
15     Q  When was the last time you spoke with
16  Jim Dondero?
17     A  About 32 days ago.
18     Q  And prior to that, how frequently were
19  you speaking to him?
20     A  Once every couple to three days.
21     Q  When's the last time you spoke with
22  Isaac Leventon?
23     A  About 35 days ago.
24     Q  And prior to that, how often did you
25  speak with Mr. Leventon?

68

1      A  Maybe a couple of times a week.
2      Q  When's the last time you spoke with
3  JP Sevilla?
4      A  Close to 40 days ago, I believe.
5      Q  And how often did you speak to him
6  prior to that?
7      A  A couple of times a week.
8      Q  When was the last time you spoke with
9  Matt DiOrio?
10     A  I would say about 30 days ago.
11     Q  How often did you speak with him prior
12  to that?
13     A  Two or three times a week.
14     Q  When was the last time you spoke with
15  Ms. Irving?
16     A  Two plus months ago.
17     Q  What did Ms. Irving do for
18  Skyview Group?
19     A  Ms. Irving has never worked for
20  Skyview Group because she is on medical leave.
21     Q  Is Skyview Group paying her any
22  compensation at all for 20 -- for -- strike that.
23         Has Skyview Group agreed to pay her any
24  compensation at all for 2021?
25     A  I have no idea.

Transcript of Scott Ellington

21 (81 to 84)

Conducted on July 29, 2021

---

81

1 this is way off the track of the purpose of the
2 deposition.
3        THE WITNESS: Exactly the same as a
4 country club membership or a hunting club or a
5 tennis club or a golf membership, but it is paid
6 to an individual rancher.
7 BY MR. CLUBOK:
8    Q    And you did enter into that arrangement
9 with Mr. Collins; right?
10   A    No, Mr. Reid.
11   Q    I'm sorry, Mr. Reid.
12   A    And -- yeah, Mr. Reid and a partner of
13 his named Nate Palmer. And, again, they formed
14 the entity. I just paid my pro rata share to the
15 LLC. They run it, they manage it.
16        It is literally a friendship thing
17 that's centered around deer hunting.
18   Q    And that firm for a while represented
19 Highland Capital Management in the litigation
20 against UBS; correct?
21   A    Correct.
22        MS. SMITH: Objection to form.
23 BY MR. CLUBOK:
24   Q    They did so until they sought to
25 withdraw earlier this year; correct?

---

82

1    A    Correct.
2    Q    Did you discuss withdrawal with them?
3    A    I did not.
4    Q    Did you discuss the UBS litigation with
5 them during -- during 2020, the last year of your
6 employment with Highland Capital Management?
7    A    Yeah, I'm sure I did at some point.
8    Q    Did you ever discuss with them what to
9 do about the judgment that UBS obtained?
10   A    No.
11   Q    Did you discuss with anybody -- strike
12 that.
13        Post bankruptcy and prior to
14 termination, did you discuss with anybody in the
15 world what to do about the judgment that UBS
16 obtained in New York?
17   A    Yes.
18   Q    Who did you discuss that with?
19   A    Again, what time period? I'm sorry.
20   Q    From the time of the bankruptcy until
21 the time you were terminated.
22   A    You, Mr. Dondero, Mr. Seery, former
23 Judge Nelms, Mr. Dubel. I think that's pretty
24 much it.
25   Q    So that's the entire list of

---

83

1 individuals that you can recall ever discussing
2 what to do about the judgment that UBS obtained in
3 New York since Highland's bankruptcy and prior to
4 you being terminated from Highland Capital
5 Management; correct?
6    A    I'm sure I hypothecated with -- I'm
7 certain that I did with Mr. Leventon just about,
8 you know, what we thought the outcome would be for
9 Mr. Sevilla. And I'm sure that I talked to
10 Mr. Reid about it several times, you know, because
11 I -- I interact with him socially, so you know how
12 those kind of conversions go.
13   Q    Anybody else at all?
14   A    Not that I can think of.
15   Q    Did you ever tell me that there was an
16 insurance policy issued by Sentinel that
17 potentially could satisfy that judgment?
18        MS. SMITH: Objection to form.
19        THE WITNESS: No.
20 BY MR. CLUBOK:
21   Q    Did you ever tell Mr. Dondero that
22 there was an insurance policy issued by Sentinel
23 that could potentially satisfy that judgment?
24   A    I didn't need to tell Mr. Dondero. He
25 was aware of it since inception.

---

84

1    Q    Did you ever tell Mr. Seery that there
2 was an insurance policy issued by Sentinel that
3 could potentially satisfy at least part of the
4 judgment that UBS obtained in New York?
5        MS. SMITH: Objection to form.
6        THE WITNESS: No.
7 BY MR. CLUBOK:
8        MR. CLUBOK: What was the form
9 objection?
10        MS. SMITH: Well, it calls for a legal
11 conclusion on what the insurance policy can do and
12 who it can pay out on.
13        MR. CLUBOK: Okay.
14 BY MR. CLUBOK:
15   Q    Did you ever tell Mr. Seery anything
16 at all about the insurance policy that was issued
17 by Sentinel with respect to the UBS litigation in
18 New York?
19   A    No.
20   Q    Did you ever tell Mr. Nelms, Judge
21 Nelms anything at all about the insurance policy
22 that was issued by Sentinel with respect to the
23 UBS litigation in New York?
24   A    No.
25   Q    Did you ever tell Mr. Dubel anything

---

Transcript of Scott Ellington
Conducted on July 29, 2021

22 (85 to 88)

---

**Page 85**

1  at all about the insurance policy that had been
2  issued by Sentinel with respect to the UBS
3  litigation in New York?
4  **A   No.**
5  Q   Did you ever tell Mr. Leventon anything
6  at all about the insurance policy that had been
7  issued by Sentinel with respect to the UBS
8  litigation in New York?
9  **A   Mr. Leventon knew about it since**
10 **inception.**
11 Q   Mr. Leventon, since inception, knew
12 that there was an insurance policy issued by
13 Sentinel with respect to the UBS litigation
14 pending in New York?
15 **A   Yes.**
16 Q   How did he know about that?
17 MS. SMITH: Objection.
18 THE WITNESS:  He was part of the
19 overall group of a dozen, if not 20, people inside
20 of Highland that went through the process of
21 approving the transaction, so he was around for
22 the genesis, then quickly became not part of that
23 process.
24 BY MR. CLUBOK:
25 Q   What do you mean quickly became not

---

**Page 86**

1  part of that process?
2  **A   It went to a process that was solely**
3  **compliance and finance and some individuals from**
4  **tax, if I remember correctly, and a couple of guys**
5  **in accounting and training.**
6  Q   When did it go to that?
7  **A   After about the second and third week**
8  **of discussing it as a possibility.**
9  Q   And Mr. Leventon never had anything
10 whatsoever to do with it after that?
11 **A   Not that I recall.**
12 MS. SMITH: Objection to form.
13 THE WITNESS:  I mean, there were --
14 there were literally two dozen people involved, if
15 not more, so I don't -- I didn't really keep a
16 leash on Mr. Leventon and his involvement, but I
17 don't remember him being intimately involved.
18 BY MR. CLUBOK:
19 Q   Did you ever mention that -- strike
20 that.
21 So you are saying Mr. Leventon -- the
22 idea first came to have a insurance policy issued
23 by Sentinel, Mr. Leventon was involved in that
24 initial conversation; correct?
25 **A   I had that initial conversation with**

---

**Page 87**

1  **Mr. Leventon because it was my idea.**
2  Q   It was your idea to have Sentinel issue
3  an insurance policy with respect to the UBS
4  litigation that was then pending in New York;
5  correct?
6  **A   Yes.**
7  Q   And when you initially had that idea,
8  you discussed it fully with Mr. Leventon?
9  **A   Well, I discussed with Mr. Leventon**
10 **because the idea came from a matter called**
11 **Cornerstone that Highland Capital Management, its**
12 **funds brought against Nautic, a private equity**
13 **advisor.  And I had never heard of an ATE policy**
14 **before.  And we discovered in that litigation that**
15 **they had made a payment out of their funds for a**
16 **premium.  And they had bought an ATE policy, and**
17 **it produced a large settlement that the debtor and**
18 **Highland Capital Management funds benefited from.**
19 Q   And as a result of that, you discussed
20 with Mr. Leventon the idea of purchasing an ATE
21 policy from Sentinel with respect to the UBS
22 litigation that was then pending in New York?
23 **A   Mr. Leventon, Mr. Sevilla, Mr. Surgent**
24 **were the initial people that I had the**
25 **conversation with.**

---

**Page 88**

1  Q   All three of those equally in terms of
2  being involved?
3  **A   They were all sitting --**
4  MS. SMITH: Objection to form.
5  THE WITNESS:  They were all sitting in
6  Mr. Surgent's office when I walked in and said is
7  it possible to do an ATE like Nautic did?
8  BY MR. CLUBOK:
9  Q   And this was the very first time that
10 you ever mentioned this idea to get an ATE policy
11 with respect to the UBS litigation to anyone?
12 **A   Yes.**
13 Q   And you mentioned that in Mr. Surgent's
14 office to a group that included Mr. Leventon,
15 Mr. Sevilla and Mr. Surgent?
16 **A   That's my memory, yes.**
17 Q   How long did you discuss it in the
18 initial meeting?
19 **A   Less than five minutes.**
20 Q   Okay.  And then after that, did you
21 ever talk to Mr. Leventon again about the idea?
22 **A   I'm sure I did, yes.  Or in a larger**
23 **group, because then it went through an approval**
24 **process and that became run by compliance.**
25 Q   And was Mr. Leventon aware that the

89

1  insurance policy was actually issued, as far as
2  you know?
3        MS. SMITH:  Objection to form.
4        THE WITNESS:  As far as I know.
5  BY MR. CLUBOK:
6     Q   And was that because you discussed it
7  with Mr. Leventon since that policy has been
8  issued?
9     A   I'm sure that I have.  I don't recall
10 it specifically, but, you know, it's like every
11 person in the firm knew.
12    Q   Every person in what firm knew?
13    A   In Highland Capital Management, I'd be
14 surprised if anyone didn't know especially above a
15 certain level because they were involved or their
16 team members were involved.
17    Q   Sorry, what specifically did every
18 person at Highland Capital Management above a
19 certain level know that you are referring to?
20    A   That the ATE policy was being
21 considered because it went through its normal
22 process that involved almost every group in the
23 firm.
24    Q   So, every single person who did an ATE
25 policy was being considered.

90

1        And roughly when was that?
2     A   Several months before it was put in
3  place.
4     Q   And how many people knew it was
5  actually put in place?
6     A   I would say the entire group that was
7  part of the process.
8     Q   So virtually every single senior person
9  at Highland Capital Management knew that the ATE
10 policy had been put in place?
11    A   That's my understanding.  I'd be
12 shocked if they didn't.  Because, again, we're
13 talking two dozen people involved in the process.
14    Q   Right.  But, as far as you --
15        You have no knowledge that Mr.Seery was
16 ever made aware of this; correct?
17    A   I-- I don't --
18        MS. SMITH:  Objection to form.
19        THE WITNESS:  I don't know if Mr. Seery
20 was made aware of it or not.
21 BY MR. CLUBOK:
22    Q   You -- you certainly never told
23 Mr. Seery about the ATE policy during your
24 employment at Highland Capital Management;
25 correct?

91

1     A   I did not.
2     Q   And you never told Judge Nelms about
3  it; correct?
4     A   I did not.
5     Q   You never told John Dubel about it;
6  correct?
7     A   I did not.
8     Q   You never took any action to make sure
9  that the court -- the bankruptcy court was aware
10 about the ATE policy; correct?
11        MS. SMITH:  Objection to form.
12        THE WITNESS:  No, I did not.
13 BY MR. CLUBOK:
14    Q   That's like one of those double
15 negatives, so let me just ask it again: It's true
16 that you never took any action to ensure that the
17 bankruptcy court became aware of the ATE policy
18 that had been taken out with respect to the UBS
19 litigation in New York; correct?
20    A   Correct.
21    Q   Did you ever make any effort to collect
22 on that policy?
23    A   I --
24        MS. SMITH:  Objection to form.
25        THE WITNESS:  No.

92

1        MR. CLUBOK:  Okay.  I think this is a
2  good time for a break.
3        THE WITNESS:  Okay.
4        THE VIDEOGRAPHER:  We're going off the
5  record at 12:05 p.m. Eastern time.
6        (Recess taken 12:05 p.m. to 12:15 p.m.)
7        THE VIDEOGRAPHER:  We're going back on
8  the record at 12:21 p.m. Eastern Time.
9  BY MR. CLUBOK:
10    Q   Okay, Mr. Ellington, we've been talking
11 about an entity that I referred to as Sentinel,
12 and I believe there's some different entities with
13 Sentinel in their name, but when we've been
14 talking about Sentinel, have you understood me to
15 be referring to Sentinel Reinsurance Limited?
16    A   Yes, I believe that is the main entity,
17 but I'd have to see an org chart.  I don't know
18 what it looks like now.
19    Q   And you recall it is a fairly
20 complicated structure with lots of different
21 entities and subs and pass-through entities and so
22 forth?
23        MS. SMITH:  Objection to form.
24        THE WITNESS:  That's my understanding.
25 BY MR. CLUBOK:

Transcript of Scott Ellington
Conducted on July 29, 2021

---

93

1    Q    And -- and if I talk about it -- if I
2  generally refer to it as Sentinel, will you
3  understand it to be the collective organization,
4  unless it's necessary to identify a specific sub
5  or a specific entity; is that okay?
6    A    Yeah, yeah, that's fine with me.  And
7  if I get into any specificity, I may need to see
8  an org chart.
9    Q    When was Sentinel formed, roughly?
10   A    My best recollection is 2012.
11   Q    What was the purpose of forming
12 Sentinel, as far as you understood?
13   A    To create a reinsurer.
14   Q    For whom?
15   A    It was -- the instruction of
16 Mr. Dondero was to make every attempt to originate
17 and structure a Cayman-based reinsurer.
18   Q    So the idea for forming Sentinel, as
19 far as you know, was Jim Dondero's.
20   A    Yes.
21   Q    And is he -- did he -- is he the one
22 who explained to you the purpose behind forming
23 Sentinel?
24   A    Yes.
25   Q    Was there anyone else in that

94

1  conversation when he initially told you about it?
2    A    I don't recall.  I think it was just me
3  and him.
4    Q    And what -- what else did he tell you
5  about the kind of business that he expected
6  Sentinel to engage in?
7    A    He wanted Sentinel to be a
8  full-serviced reinsurer, not just a captive.
9    Q    Why?
10   A    Because he had attempted to do that
11 with Gov Re, and due to regulatory issues, again,
12 beyond my knowledge, he thought that Cayman was a
13 better place to domicile a new reinsurer.
14   Q    Was the idea that -- when you say --
15 when you say a full-service reinsurer, not just a
16 captive, what's the distinction that you
17 understood him to be making?
18   A    That captive reinsurers serve a limited
19 set of counter-parties and ensure a limited set
20 where a full service, it serves any and all
21 potential parties.
22   Q    And did he talk to you about the
23 economics during this initial conversation?
24   A    Meaning what?
25   Q    Meaning who would have the economic

---

95

1  interest in Sentinel if it was established.
2    A    No.
3    Q    When did he -- did he ever speak to you
4  about the economics of Sentinel?
5    A    When you mean the economics, who would
6  ultimately the potential beneficial owners?
7    Q    Yes.
8    A    At a much later date after it was
9  established?
10   Q    Roughly when?
11   A    I would say probably six to nine
12 months, if not a year, after it was established.
13 I really can't remember.
14   Q    And what was the nature of that
15 conversation, as best you can remember?
16   A    That because me and my team had been
17 able to pull it off, that I would have some
18 beneficial ownership.
19   Q    Because you were able to pull off
20 establishing this full-service reinsurer?
21   A    Yes.
22   Q    And when you say "some beneficial
23 ownership" ultimately you obtained about
24 30 percent; correct?
25   A    Again, or entities somehow related to

96

1  me.
2    Q    At what point did he tell you that
3  that's the percentage you would get?
4    A    I don't recall.
5    Q    Well, roughly, how long after it was
6  formed before --
7    A    I don't know.  I'm sorry, I didn't let
8  you finish your question.
9    Q    Sure.  Was it, you know, within the
10 first year that it was formed?  Was it five years
11 later?  Just your best estimate.
12   A    Oh, within the first year.  That's a
13 very long due diligence period from the regulator.
14   Q    So within the first year of Sentinel
15 being formed, it was established that you would,
16 at least indirectly, if not directly, have a
17 roughly 30 percent economic interest in Sentinel;
18 correct?
19   A    Correct.
20   Q    And Mr. Dondero would retain the other
21 roughly 70 percent economic interest, as far as
22 you understood; correct?
23   A    As far as --
24       MS. SMITH:  Objection to form.
25       THE WITNESS:  As far as I understood,

Transcript of Scott Ellington

Conducted on July 29, 2021

29 (113 to 116)

113

1    A    I believe so, but I'm not certain.
2    I cant remember, but I believe se may have been.
3    Q    And why was she there?
4    A    She was along on the trip to do other
5    business with us, and she attended the meeting.
6    Q    What business was Ms. Irving doing that
7    was unrelated to Sentinel?
8    A    Relative to SAS Management.
9    Q    So Ms. Irving was in the Caymans on
10   that trip only with respect to business on behalf
11   of SAS?
12   A    Yes.
13   Q    But you brought her along to this
14   meeting with CIMA that was specifically focused on
15   Sentinel?
16   A    Yes.
17   Q    Why?
18   A    Because she asked if she should come
19   and listen, and I said sure.
20   Q    Why?
21   A    I guess she had a curiosity.  I don't
22   know.
23   Q    Did you report to anyone about this
24   meeting who was not at the meeting?
25   A    No.

114

1    Q    So, no one other than you, Mr. Sevilla,
2    Mr. DiOrio, Jan, Sentinel's counsel and Ms. Irving
3    were informed about this meeting to the best of
4    your knowledge?
5    A    To my knowledge, that's the only people
6    that were informed, yes.
7    Q    And at this meeting, did you talk about
8    the prospects -- this is after the trial had
9    already occurred; right?
10   A    I believe so, yeah.
11   Q    And so for example, at the trial, the
12   court ruled from the bench that -- in a way that
13   disallowed one of the defendant's arguments
14   specifically with respect to offset for hedging.
15       Do you remember that?
16   A    I do.
17   Q    What's that?
18   A    Yes, I do.
19   Q    Did you tell CIMA about that
20   development at trial?
21   A    I did not tell CIMA anything about the
22   developments at trial.
23   Q    Did they ask?
24   A    No, they did not.
25   Q    Who spoke at the meeting, other than

115

1    you?
2    A    I did not speak at the meeting.
3    Q    Who did?
4    A    Mostly Cayman counsel.  I remember Jan
5    discussing the portfolio, and potentially
6    Mr. DiOrio.  I don't recall if he spoke or not.
7    Q    Did anyone give any details about what
8    had happened at the trial?
9    A    No.
10   Q    Did anyone talk about the merits of the
11   UBS litigation in any way?
12   A    No.
13   Q    At the time -- now, you previously said
14   a number of times that you believed that the
15   defendants were going to lose that litigation even
16   before the verdict came out; right?
17   A    Yes, I did.
18   Q    And in fact, you believed there was a
19   decent chance that the defendants would get hit
20   with substantial portion, if not all, of the
21   billion dollars that was being sought; correct?
22   A    I didn't have an -- idea as to damages,
23   but I thought the -- there was a likelihood that
24   the defendants would lose.
25   Q    And you thought there was a likelihood

116

1    that the damages would be substantial, at least in
2    the several hundred million dollar range; correct?
3    A    Again, I had no insight into what
4    damages or how they would be calculated, but I
5    thought the defendants would lose.
6    Q    And you said a number of times that it
7    didn't surprise you at all about the size or the
8    magnitude of the damages verdict; correct?
9    A    Correct.
10   Q    And you had warned Mr. Dondero, in
11   words or substance, that this was likely to occur
12   before the verdict came; correct?
13   A    Yes.
14   Q    Did you ever communicate those beliefs
15   about the likelihood of a large judgment being
16   issued against the defendants to anybody
17   affiliated with Sentinel?
18   A    Myself, no.
19   Q    Did you -- are you aware of those
20   beliefs about the likelihood of a large judgment
21   being issued against the defendants in the UBS
22   litigation being communicated to anyone affiliated
23   with Sentinel?
24   A    Am I personally aware of it?  No.
25   Q    Were you made -- did you get any --

**117**

1  strike that.
2       Did you ever come to believe that
3  anyone at Sentinel was being advised as to the
4  likelihood of a significant judgment coming out of
5  the trial?
6    A  Yes.
7    Q  Describe the nature of that belief and
8  the circumstances.
9    A  I believe, and I was told anecdotally,
10 that Cayman counsel was following the matter very
11 closely and updating the directors in their
12 capacity.
13   Q  And Cayman counsel being Simone?
14   A  Yes. And I believe there may have been
15 other Cayman counsel that Sentinel directors
16 retained, but I don't know that.
17   Q  Who told you that Cayman counsel was
18 following it very closely?
19   A  Simone.
20   Q  And -- but you never saw her
21 communicate -- strike that.
22      You never were copied on any
23 communication she had with the Sentinel directors
24 about the merits of the litigation?
25   A  Never.

**118**

1    Q  And you don't know anything more than
2  she assured you that the Sentinel directors were
3  being closely informed?
4    A  A general statement as we were walking
5  from the car into CIMA.
6    Q  So she told you on the way in words to
7  the effect that the directors know all about the
8  events of the litigation and that prospects?
9    A  Yes.
10      MS. SMITH: Objection, form.
11      THE WITNESS: Yes.
12 BY MR. CLUBOK:
13   Q  Other than that, were you ever made
14 aware in any way of what extent to which the
15 directors at Sentinel were being kept apprized of
16 the prospects for the New York litigation against
17 UBS?
18   A  No.
19   Q  And in between that meeting in August
20 of '19 and the meeting in the fall with Isaac
21 Leventon where you described, did you ever discuss
22 the ATE policy with any other human in the world?
23      MS. SMITH: Objection to form.
24      THE WITNESS: Not that I recall.
25      MR. CLUBOK: And what's the form

**119**

1  objection for that question?
2       MS. SMITH: I'm not going to explain
3  all of my objections.
4       MR. CLUBOK: All right. Okay. I have
5  a right to ask, and if you don't have a -- okay.
6  I have a right to correct the form objection. So
7  if there is a form objection, I have the right to
8  ask you what the basis is, so I can correct it if
9  it's -- if it's necessary.
10      Are you going to tell me anything more
11 than just objection to form?
12      MS. SMITH: Okay. Well, any other
13 human in the world is fake.
14 BY MR. CLUBOK:
15   Q  Okay. Mr. Ellington, when I say any
16 other human in the world, are you confused that I
17 might be talking about animals or something;
18 nonhuman -- nonhumans?
19   A  Not confused. But it's certainly very
20 difficult to remember what I said to every human
21 in the world, well over a period of five years.
22   Q  Sure. But between August of 2019, when
23 you met in the Caymans with CIMA and the
24 discussions you had with Mr. Leventon that you've
25 described in the fall of 2020, did you discuss the

**120**

1  ATE policy with anybody else at all that you can
2  think of, sitting here today?
3    A  Not that I recall.
4    Q  Did Mr. Leventon ever seek out your
5  advice as to whether or not to disclose the
6  existence of the policy to the independent
7  directors that were appointed to manage Highland's
8  affairs in the bankruptcy?
9    A  Not that I specifically recall.
10   Q  Did Mr. Leventon ever seek out your
11 advice as to whether or not to disclose the
12 existence of the ATE policy to the Pachulski firm
13 or any lawyer that was representing Highland in
14 connection with the bankruptcy?
15   A  Not that I recall.
16   Q  Do you recall ever discussing with
17 Mr. Leventon whether or not the ATE policy should
18 be disclosed in connection with the bankruptcy?
19   A  No, not Mr. Leventon.
20   Q  With anyone?
21   A  Maybe I didn't understand your
22 question. I'm sorry.
23      Could you ask -- could you please ask
24 it again?
25   Q  Did you ever recall discussing with

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM    INDEX NO. 650744/2023
NYSCEF DOC. NO. 121    HIGHLY CONFIDENTIAL - STPO - INFORMATION REDACTED NYSCEF: 02/08/2023

Transcript of Scott Ellington
Conducted on July 29, 2021                         34 (133 to 136)

133

1    THE WITNESS: I generally knew that
2 they were -- they were looking at the assets of
3 those entities, yes.
4 BY MR. CLUBOK:
5    Q   And you knew that the trigger for the
6 ATE policy had already occurred as of the date of
7 the judgment?
8    MS. SMITH: Objection to form.
9 BY MR. CLUBOK:
10   Q   Correct?
11   A   I disagree.
12   Q   Why do you disagree with that?
13   A   It was intimated to me that the trigger
14 would be a perfection of a judgment from New York
15 to the Cayman Islands.
16   Q   Who intimated that to you?
17   A   CIMA.
18   MS. SMITH: Objection.
19 BY MR. CLUBOK:
20   Q   CIMA did?
21   A   Yes.
22   Q   When?
23   A   In the meeting aforementioned in August
24 of '19.
25   Q   So it was intimated to you that until

134

1 the judgment was perfected in the Cayman Islands,
2 there was no trigger for paying ATE?
3    A   Yes.
4    Q   Who specifically intimated that to you?
5    A   CIMA.
6    Q   Who, name of a human being.
7    A   I don't know the human being's name.
8 There was five people from CIMA in the room. It
9 was three years ago.
10   Q   When you say it was intimated, what do
11 you mean?
12   A   They said there is not a claim on the
13 policy to perfect the judgment here.
14   Q   Was it a man or a woman who said that?
15   A   It was a man.
16   Q   Was it the man who was the -- was there
17 one person who was the principal spokesperson for
18 CIMA at this meeting?
19   A   Yes.
20   Q   And you just don't remember his name?
21   A   No.
22   Q   Did you have any documents, records of
23 this meeting?
24   A   No.
25   Q   And now if there is a settlement, that

135

1 would also trigger the policy; correct?
2    MS. SMITH: Objection to form.
3    THE WITNESS: I don't have the
4 expertise to say whether that triggers a policy or
5 not. That's not a determination I could make.
6 BY MR. CLUBOK:
7    Q   Isn't it true that Mr. Leventon at some
8 point consulted with you about whether or not he
9 should disclose the policy to either Mr. Seery or
10 the lawyers at the Pachulski firm?
11   A   I don't know.
12   MS. SMITH: Objection to form.
13 BY MR. CLUBOK:
14   Q   Sorry, can you answer the -- I think
15 your answer came in over Ms. Smith's objection, so
16 I'll ask the question again.
17   Is it true that Mr. Leventon at some
18 point consulted with you about whether or not he
19 should disclose the ATE policy to either Mr. Seery
20 or the lawyers at the Pachulski firm?
21   A   I don't recall.
22   Q   Between -- other than this meeting with
23 CIMA and the discussion you had with Mr. Leventon,
24 did you ever discuss the ATE policy with anyone
25 else in the world since the bankruptcy that you

136

1 can recall other than --
2    A   Not that I recall.
3    Q   -- other than Ms. Smith?
4    A   Not that I recall.
5    Q   Did you ever discuss -- when was the
6 last time you spoke to Mr. Dondero about the ATE
7 policy?
8    A   I would say at least two years.
9    Q   And what was the nature of that
10 conversation?
11   A   I believe that Mr. Dondero asked me if
12 it was still in place.
13   Q   Roughly when was that?
14   A   I would say sometime in 2018.
15 That's -- that's my best guess.
16   Q   Was it before or after the trial?
17   A   Before.
18   Q   So before the trial, he asked you if
19 the ATE policy was still in place?
20   A   Yes.
21   Q   And what did you say?
22   A   I said as far as I know, yes.
23   Q   And after the trial, but before the
24 judgment, did you ever speak with Mr. Dondero
25 again about the ATE policy?

137

1    A   Not that I recall.

2    Q   And after the judgment, did you ever
3  talk to Mr. Dondero about how the ATE policy could
4  somehow be used to satisfy the judgment or settle
5  the case?

6    A   No.

7        MS. SMITH:  Objection to form.

8        THE WITNESS:  Not that I recall.

9  BY MR. CLUBOK:

10   Q   Right before the bankruptcy, you tried
11 to settle the claims against CDO Fund, SOHC and
12 HFP; correct?

13   A   Yes, I approached you to try to
14 structure a settlement.

15   Q   And you claimed at the time that those
16 funds were ghost funds, in your words; correct?

17   A   Yes.

18   Q   And you -- basically, you said, in
19 substance, though, they had no assets left, but if
20 there was a settlement, that Mr. Dondero could
21 come up with funds from some other source to
22 satisfy a relatively small settlement on behalf of
23 those funds; is that true?

24   A   On behalf of all defendants, yes.

25   Q   Well, you specifically talked about --

138

1  you specifically talked about settling the
2  non-HCM-related claims for a relatively small
3  amount and then separately agreeing to an allowed
4  claim for HCM; isn't that true?

5    A   That was one of the options you and I
6  discussed.  We discussed many options.

7    Q   And you never disclosed the fact that
8  there was an ATE policy that could satisfy a
9  potential settlement of the claims against CDO
10 Fund, SOHC and HFP; correct?

11   A   Correct.

12       -- (overspeaking) --

13       MS. SMITH:  Objection, form.

14 BY MR. CLUBOK:

15   Q   I want to make sure the court reporter
16 got the -- okay.  There was simultaneous speakers,
17 so I don't think she heard your answer even though
18 the audio will capture it.

19       And do me a favor, Mr. Ellington.
20 Since Ms. Smith is objecting sometimes, if you
21 could -- I really appreciate you giving answers
22 quickly on the one hand.  On the other hand, if
23 you could just take one more beat so that you are
24 not talking over her as she's making her
25 objections, that will be helpful.

139

1    A   Absolutely.  It is my fault, and there
2  is some slight delay on my end, so I think that's
3  part of the problem.  I apologize.

4    Q   That's okay.  I appreciate -- again,
5  like I said, I appreciate your effort to just
6  answer these questions clearly, but you overshot
7  that by a scooch.

8    A   I apologize to both you and Ms. Smith
9  and the court reporter.  I'm not trying to do that
10 at all.

11   Q   No, no, I understand.  I understand.

12   A   Yeah.

13   Q   So let me just ask it one more time.

14       You never disclosed in the course of
15 any settlement discussions with UBS's counsel that
16 there was an ATE policy that could satisfy a
17 potential settlement of the claims against CDO
18 Fund, SOHC and HFP; correct?

19   A   The only person I discussed it with was
20 you, and, no, I did not disclose that.

21   Q   I apologize if I've asked this earlier:
22 Did Sentinel ever have a shared services agreement
23 with Highland Capital Management?

24   A   Not that I'm aware of.

25   Q   Does it have one today with Skyview?

140

1    A   Not that I'm aware of.

2    Q   Does it have a client relationship with
3  Skyview?

4        THE WITNESS:  Not that I'm --

5        MS. SMITH:  Object to the form.

6        THE WITNESS:  Sorry, not that I'm aware

7  of.

8  BY MR. CLUBOK:

9    Q   Let's turn to what's behind tab 2,
10 Exhibit 50.

11       I think we do have here -- we've asked
12 you before about the ownership interest, and you
13 said you had seen some documents.  Hopefully this
14 will help refresh your recollection.

15   A   You want me to go ahead and open the
16 envelope, Mr. Clubok?

17   Q   Yeah, open Exhibit 50.  Exhibit 50 --
18 while you're opening it, I'll just describe -- is
19 an email exchange that starts with an email from
20 Mr. Sevilla to SEI-IS-Highland and that appears to
21 be to someone named Daniel Bowen, and there is
22 some back and forth that continues through the
23 email chain between these two individuals.

24       Do you have Exhibit 50 in front of you?

25   A   I do.

**FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM**    INDEX NO. 650744/2023

NYSCEF DOC. NO. 121    RECEIVED NYSCEF: 02/08/2023

HIGHLY CONFIDENTIAL - STPO - INFORMATION REDACTED

Transcript of Scott Ellington
Conducted on July 29, 2021

39 (153 to 156)

153

1  believe. Let me see.
2      Q   You should.
3      A   I think I do. Sorry. Yes, I have it.
4          May I open it now?
5      Q   Yeah, if you could open it, please.
6  And while you're opening it, I will represent that
7  Exhibit 26 was attached to Exhibit 50 in the
8  original email.
9          And Exhibit 26 shows at the top,"The
10  fund, Multi Strat Credit Fund, with an investor
11  Sentinel Reinsurance."
12         Do you see that?
13     A   Investor Sentinel Reinsurance Limited,
14  yes.
15     Q   And it talks about the beneficial
16  owners of Sentinel Reinsurance being 70 percent
17  Patton Limited and 30 percent Minutes Limited;
18  correct?
19     A   Yes.
20     Q   And, in turn, under Patton, it has the
21  breakdown of various beneficial ownerships. But
22  the only individual identified is James Dondero.
23         Do you see that?
24     A   I do.
25     Q   And then with respect to the Mimic

154

1  Holdings it says, 100 beneficial ownership,
2  Montage Holding Limited which, in turn,
3  100 percent beneficial ownership AHL Holdings LP,
4  which, in turn, has 99 percent beneficial
5  ownership, Elderflower Limited, which, in turn, is
6  100 percent beneficial ownership, Scott Ellington,
7  you. Correct?
8      A   I see that, yes.
9      Q   And does that -- seeing this, does that
10  confirm that at the time of the ATE policy, you
11  had close to or approximately 30 percent
12  beneficial ownership ultimately in Sentinel?
13         MS. SMITH: Objection to form.
14         THE WITNESS: That's what this document
15  seems to suggest. But I don't know where this
16  information came from to SEI. I don't know.
17  BY MR. CLUBOK:
18     Q   Do you have any reason to believe that
19  it's inaccurate?
20     A   I'd have to see the org chart at the
21  time that this was generated. I just don't
22  remember.
23     Q   Do you -- as you sit here today, do you
24  have any reason to believe that this would be
25  inaccurate information?

155

1          MS. SMITH:  Objection to form.
2  Answered.
3          THE WITNESS:  I can't say whether it is
4  or isn't without the documents.
5  BY MR. CLUBOK is -- my simple question is
6      Q   My question is -- my simple question is
7  whether you can say it isn't.
8          Do you -- as you sit here today,
9  looking at this, do you -- do you know any reason
10  why this would be inaccurate?
11     A   Without the documents, I cannot say
12  it's inaccurate.
13     Q   What further documents would you need
14  to know whether or not this is accurate?
15     A   Well, I would have to see the documents
16  of all these entities.
17     Q   Okay. Did you ever contribute capital
18  to Sentinel?
19     A   Excuse me?
20     Q   Did you ever contribute any capital to
21  Sentinel?
22     A   Did I ever contribute any capital to
23  Sentinel?  No, I do not believe so.
24     Q   Did you ever -- unless -- and when I
25  say Sentinel, I mean Sentinel Reinsurance Limited.

156

1          Did you ever put any investment or
2  funds into Sentinel Reinsurance Limited?
3      A   I don't know.
4      Q   You don't know?
5      A   I don't know. It could have been
6  capitalized in a way that I -- I personally did
7  not, no.
8      Q   Let's look at what's been marked as
9  Exhibit 77.
10         MR. CLUBOK: And Nate, when I call
11  these out, I know Mr. Ellington's got a hard copy,
12  but can you also put it up on the screen to make
13  it easy. We'll see it both ways.
14         REMOTE TECHNICIAN: Yes, sir. That was
15  77?
16         MR. CLUBOK: Yes, tab four.
17  BY MR. CLUBOK:
18     Q   This is a document that says, "Scott
19  Ellington Schedule of Certain Cash and Investments
20  and Accountant's Compilation Report, October 31st,
21  2018." Do you see that?
22     A   I do.
23  BY MR. CLUBOK:
24     Q   And the second page references an
25  entity called Seville Dodge and Company; do you

HIGHLY CONFIDENTIAL - STPO - INFORMATION REDACTED

Transcript of Scott Ellington
Conducted on July 29, 2021

40 (157 to 160)

157

1 see that?
2    A  I do.
3    Q  Who are they?
4    A  An accounting firm.
5    Q  And they're your accounting firm.
6    A  They assist along with outside counsel
7 in tax preparation.
8    Q  Okay.  And in the end of 2018, they
9 compiled a schedule of certain cash and
10 investments of you as of October 31st, 2018;
11 correct?
12    A  That seems to be what 7359 is.
13    Q  Why did they do that?
14    A  I was applying for a Cayman banking
15 license, and this was requested by CIMA.
16    Q  Okay.  And so you had to make sure you
17 provided accurate information to CIMA?
18    A  Yes.
19    Q  And did Sevilla -- do you trust that
20 Sevilla accurately reported your cash and
21 investments as of October 31st, 2018?
22    A  I trust that they --
23       MS. SMITH:  Object to form.
24       THE WITNESS:  -- did their best to
25 accurately report, yes.

158

1 BY MR. CLUBOK:
2    Q  And on the second page it says,
3 "Investment in Sentinel Reinsurance Limited
4 11.8 million."
5       Do you see that?
6    A  Yes, I do.  And Sentinel Reinsurance
7 Limited, yes.
8    Q  Right.  And does that refresh your
9 recollection that you invested 11.8 million in
10 Sentinel Reinsurance Limited?
11    A  No, it does not.  I don't -- I don't
12 know what that's referencing.
13       I never invested personally $11 million
14 in anything?
15    Q  Was that -- was that a valuation of
16 your investment in Sentinel Reinsurance at the
17 time?
18    A  That's what my belief is, yes.
19    Q  And what was -- where -- did you -- did
20 you ensure that Sevilla Dodge and Company had
21 accurate information so they could make an
22 accurate representation of the value of your
23 investment in Sentinel Reinsurance at the time?
24    A  Yes.  But, I mean, I didn't provide any
25 valuation to them.  They -- I presume them or

159

1 other professionals did the valuation.
2    Q  Well, you caused this to be prepared so
3 that you could submit it to CIMA to get a banking
4 license; right?
5    A  At the request of CIMA, yes.
6    Q  Understood.  And did you -- are you
7 reasonably certain that it was accurate?
8       MS. SMITH:  Objection to form.
9       THE WITNESS:  I -- I don't have
10 enough -- I don't have enough expertise to
11 understand these type of valuations.  That's why I
12 hire professionals to do it.
13 BY MR. CLUBOK:
14    Q  Yeah, but do you -- did you take care
15 to ensure that you hired a professional that you
16 can rely on and that you provided that
17 professional with all the information reasonably
18 necessary to be accurate to the best of your
19 ability?
20    A  Myself or other -- those are other
21 entities because I couldn't provide information on
22 Sentinel.  The independent directors would have to
23 do that.
24    Q  Did you take any affirmative obligation
25 to do everything reasonably possible to ensure

160

1 that the information that's set forth in Exhibit
2 77 is as accurate as possible?
3    A  Yes, I provided any information I had
4 access to and requested that other entities that
5 were controlled by directors or others would
6 provide the information to Sevilla Dodge.
7    Q  And to the best of your -- do you feel
8 comfortable relying upon the work of Sevilla Dodge
9 and Company as of the date of Exhibit 77 as
10 reflected here?
11    A  They are a reputable accounting firm
12 with highly trained professionals, so I relied on
13 their expertise.
14    Q  And why would Matt DiOrio have a copy
15 of this?
16    A  I don't know.
17       MS. SMITH:  Objection to form.
18 BY MR. CLUBOK:
19    Q  Did you share this information
20 intentionally with Matt DiOrio?
21    A  Not that I recall, no.
22    Q  Does -- as far as you know is Matt --
23 when Matt DiOrio was at Highland, did he have any
24 need, as far as you know, to have access to this
25 document based on what you understood his job to

HIGHLY CONFIDENTIAL - STPO - INFORMATION REDACTED

405

1  too and then the final in ten days.
2        MR. CLUBOK:  Thank you so much.  Thank
3  you Nate, and Lisa and Robert Leonard for sticking
4  around this late.
5        REMOTE TECHNICIAN:  I just wanted to
6  confirm as far as the exhibits go, do you just
7  want the new exhibits, 86 through 92, attached to
8  this transcript?
9       MR. CLUBOK:  That's a great question.
10 (Deposition concluded at 8:20 p.m. EST)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

406

1        REPORTER'S CERTIFICATION
2        I, Lisa M. Barrett, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  Said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13        IN WITNESS WHEREOF, I have hereunto set
14 my hand this 10th day of August, 2021.
15
16
17 _____
18  LISA M. BARRETT, RPR, CRR, CRC
19  NOTARY PUBLIC IN AND FOR
20  THE STATE OF MARYLAND
21
22
23
24
25